95617

SEALED

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLERK US DISTRICT COURT NORTHERN DIST. OF TX FILED

2016 NOV 16 P 2:45

DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, THE STATES OF CALIFORNIA, COLORADO, TEXAS, and WASHINGTON *ex rel.* IIRT, LLC,<br><br>Plaintiff and Relator,<br><br>vs.<br><br>SIGHTLINE HEALTH, LLC,<br>SIGHTLINE DEVELOPMENT COMPANY, LLC,<br>SIGHTLINE ONCOLOGY SERVICES, LLC,<br>INTEGRATED ONCOLOGY NETWORK, LLC,<br>SL COLORADO SPRINGS LEASING, LLC,<br>SIGHTLINE COLORADO SPRINGS HOLDINGS, LLC,<br>SL DENVER LEASING, LLC,<br>SIGHTLINE DENVER LEASING HOLDINGS, LLC,<br>SL NORTH TEXAS LEASING, LLC,<br>SIGHTLINE FORT WORTH LEASING HOLDINGS, LLC,<br>SL KANSAS CITY LEASING, LLC,<br>SIGHTLINE KANSAS CITY HOLDINGS, LLC,<br>SL LUBBOCK IMRT, LLC,<br>SIGHTLINE LUBBOCK IMRT HOLDINGS, LLC,<br>SL MED CENTER IMRT, LLC,<br>SIGHTLINE MEDICAL CENTER IMRT HOLDINGS, LLC,<br>SL SANTA MONICA IMRT, LLC,<br>SIGHTLINE SANTA MONICA IMRT HOLDINGS, LLC,<br>SL SEATTLE IMRT, LLC,<br>SIGHTLINE SEATTLE IMRT HOLDINGS, LLC, | : | Civil Action No. ~~ND~~<br>Judge: 3-16CV-3203N<br><br>**FILED UNDER SEAL**<br>**PURSUANT TO 31 U.S.C. § 3730(b)(2) AND LOCAL RULE 79.3**<br><br>**DO NOT SERVE**<br><br>**DO NOT PUT ON PACER** |

SL WEST HILLS IMRT, LLC, :
SIGHTLINE WEST HILLS IMRT HOLDINGS, LLC, :
SL WEST HOUSTON IMRT, LLC, :
SIGHTLINE WEST HOUSTON IMRT HOLDINGS, LLC, :
DR. BRYAN C. BRUNER, :
T.J. FARNSWORTH, JR., :
DR. WAYNE D. HEY, :
DR. GALEN E. HOWARD, :
DR. DANIEL G. MCBRIDE, :
DR. DENNIS L. ORTIZ, :
DR. WILLIAM A. SMITH, JR., :
BRYAN SHINGLETON, :
DR. ROBERT G. STROUD, :
:
Defendants. :

**COMPLAINT FOR VIOLATIONS OF FEDERAL AND STATE FALSE CLAIMS ACTS**

## I. INTRODUCTION

1. Relator IIRT, LLC, brings this action pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and the False Claims Acts of California, Texas, Colorado, and Washington.

2. Defendant Sightline Health, LLC, and its affiliate and investor, Integrated Oncology Network, LLC, (ION) are engaged in a kickback scheme which results in the submission of false claims to the United States and the named States, by paying doctors to refer cancer patients to Sightline/ION clinics for the provision of one of the most expensive radiation therapies available. In doing so, Defendants entice doctors to put their own profit motive ahead of their patients' best interests and cause patients to receive treatments that may not be medically necessary.

3. Sightline and ION develop radiation oncology clinics across the United States which treat patients primarily, if not exclusively, with intensity-modulated radiation therapy

(IMRT), one of the most costly cancer treatments. They ensure a constant and profitable stream of patient referrals to their clinics by soliciting urologists and other physicians to invest in the development of the facility. Once invested, the doctors are powerfully influenced to send all their cancer referrals to the clinic, because they profit from their investment only if the clinic has a sufficient flow of patients to permit investor distributions. Thus, the physicians are both investors in and referrers to the Sightline/ION facilities.

4. The investing/referring doctors receive a significant portion of the profits generated by their own referrals. This conduct violates the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the physician self-referral Stark Law, 42 U.S.C. § 1395nn, and state equivalents. Claims for services submitted in violation of these laws result in non-payable, false claims to federal and state healthcare programs, all in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and its state equivalents.

5. Sightline's and ION's conduct, in concert with the conduct of the investing/referring physicians, harms government health care programs and illegally influences doctors to refer patients based on the doctors' financial interest.

6. The investing/referring doctors refer patients for expensive radiation therapy more often than equivalent or better, cheaper therapies—at greater cost to both patients and government healthcare programs—because they have a financial interest in the treatment.

## II. JURISDICTION AND VENUE

7. The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

8. The Court has personal jurisdiction over the Defendants, and venue lies under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a), because Defendants operate and transact business in this district.

9. The allegations in this complaint have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, nor in any congressional, administrative, or Government Accountability Office, or other Federal report, hearing, audit, or investigation, or in the news media.

10. Relator is an original source of the information upon which this complaint is based, as that phrase is used in the False Claims Act. 31 U.S.C. § 3730(e)(4)(B) and the similar laws of the Plaintiff States.

## III. PARTIES

11. The real parties in interest to the claims in this action are the United States of America and the Plaintiff States.

12. Relator IIRT, LLC, is a Limited Liability Company formed in Delaware.

13. Integrated Oncology Network, LLC, is a Delaware limited liability company formed in 2011, headquartered in Corona del Mar, California. It is affiliated with Integrated Oncology Network Holdings, LLC, another Delaware limited liability company formed in 2009. ION represents itself as a privately held company whose shareholders consist of "a small group of strategic investors," which includes private investment firms. In 2011, ION made a "strategic investment" in Sightline and the two became venture partners. ION represents Sightline clinics as "Our Centers" on its website, www.ion-llc.com/centers.html. Sightline Health's website, sightlinehealth.com, directs visitors to "Contact ION" at its California headquarters.

14. Sightline Health, LLC, was formed as a Texas limited liability company in June 2005. In 2007, it became a Delaware company and registered as a foreign LLC in Texas in 2009. It is headquartered in Houston and T.J. Farnsworth, Jr., is its registered agent. The company and its affiliates and subsidiaries develop and manage radiation oncology clinics nationwide. Its CEO was Defendant T.J. Farnsworth, Jr. until December 31, 2014. Sightline Health represents on its website that it is a national healthcare company that builds and operates patient-focused facilities providing advanced, non-invasive treatment options for cancer through two divisions, Sightline Development Company and Sightline Oncology Services.

15. Sightline Development Company, LLC, was formed as a Texas limited liability company in 2011. It is headquartered in Houston and Thad H. Armstrong is its registered agent. It develops new Sightline radiation clinics and provides management services for Sightline Clinics in several locations around the United States. It is a subsidiary of Sightline Health/ION.

16. Sightline Oncology Services, LLC, was formed as a Texas limited liability company in 2007. It is headquartered in Houston and Sightline Health is its registered agent. It, in conjunction with its affiliates and subsidiaries, provides billing, administrative, and collections services to the radiation oncologist tenants of Sightline Health and Sightline Development Company's clinic-leasing affiliates. Sightline Oncology Services advertises that it brings advanced cancer-fighting technologies to their centers by building, staffing and operating cancer centers.

17. SL North Texas Leasing, LLC, was formed as a Texas limited liability company in October 2013. It is headquartered in Houston and Defendant Sightline North Texas Leasing Holdings, LLC, is its registered agent. It is the entity of which the Defendant Physician-Investors named in the present complaint own 80%. Sightline Health and ION, through the

subsidiary Sightline Development Company, own the remaining 20%. It leases space in a medical office building, Baylor Medical Center at Trophy Club, in an area of Roanoke, Texas (a Dallas suburb), known as Trophy Club. The space is, in turn, subleased to a radiation oncology practice. The clinic operates under the name of Lonestar Radiation Oncology. Lonestar Radiation Oncology began providing services on November 3, 2014. According to the website of Defendant ION, "administrative and management resources [for Lonestar] are provided by Sightline Health."

18. The radiation oncology practice which operates Lonestar Radiation Oncology is, upon information and belief, owned by Defendant Dr. Charles H. Matthews, M.D., whom Lonestar Radiation Oncology advertises as its radiation oncologist on its website. According to Texas Medical Board verification files, Dr. Matthews was issued a physician temporary license on October 20, 2014, and final licensure on November 7, 2014.

19. Sightline North Texas Leasing Holdings, LLC, was formed as a Texas limited liability company in October 2013. It is headquartered in Houston and Sightline Development Company, LLC, is its registered agent. It is the affiliate of Sightline Health through which Sightline and ION own 20% of SL North Texas Leasing and control the latter's management.

20. Other affiliated Sightline companies include: SL Colorado Springs Leasing, LLC, a Texas limited liability company formed in 2012; Sightline Colorado Springs Holdings, LLC, a Texas limited liability company formed in 2012; SL Denver Leasing, LLC, a Texas limited liability company formed in 2011; Sightline Denver Leasing Holdings, LLC, a Texas limited liability company formed in 2011; SL Kansas City Leasing, LLC, a Texas limited liability company formed in 2012; Sightline Kansas City Holdings, LLC, a Texas limited liability company formed in 2012; SL Lubbock IMRT, LLC, a Texas limited liability company formed in

2008; Sightline Lubbock IMRT Holdings, LLC, a Texas limited liability company formed in 2008; SL Med Center IMRT, LLC, a Texas limited liability company formed in 2007; Sightline Medical Center IMRT Holdings, LLC, a Texas limited liability company formed in 2007; SL Santa Monica IMRT, LLC, a Texas limited liability company formed in 2009; Sightline Santa Monica IMRT Holdings, LLC, a Texas limited liability company formed in 2009; SL Seattle IMRT, LLC, a Texas limited liability company formed in 2010; Sightline Seattle IMRT Holdings, LLC, a Texas limited liability company formed in 2010; SL West Hills IMRT, LLC, a Texas limited liability company formed in 2009; Sightline West Hills IMRT Holdings, LLC, a Texas limited liability company formed in 2009; SL West Houston IMRT, LLC, a Texas limited liability company formed in 2008; and Sightline West Houston IMRT, LLC, a Texas limited liability company formed in 2008. The registered agents for these entities vary, but all are Sightline Health/ION affiliates or subsidiaries. Each pair is believed to operate in tandem, as SL North Texas Leasing and Sightline North Texas Leasing Holdings operate, the former serving as the lessor of the clinic's premises and the entity in which the referring physicians invest and through which they receive distributions, and the latter serving as one vehicle through which Sightline Health and ION control and profit from the cancer clinics.

21. Defendant T.J. Farnsworth, Jr., is a resident of Texas. He is the founder of Sightline and has held positions in several Sightline companies, including President, CEO, and Manager. He also served as registered agent for Sightline Health, LLC, from 2005 until December 31, 2014. He has been a member of the Management Team of Defendant Integrated Oncology Network, LLC. He is believed to have been a 30% owner of Sightline Health as recently as December 2015.

22. Defendant Bryan Shingleton is a resident of Texas. He was Director of Development at Defendant Sightline Development Company, LLC, and he personally solicited physicians to become investors in Defendant SL North Texas Leasing, LLC, and, upon information and belief, other Sightline entities.

23. Defendant Dr. Bryan C. Bruner is a resident of Texas. He is a urologist who practices at Urology Clinics of North Texas in Grapevine, Texas, and an investor in Defendant SL North Texas Leasing, LLC.

24. Defendant Dr. Wayne D. Hey is a resident of Texas. He is a urologist who practices at DFW Urology Consultants in Fort Worth, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

25. Defendant Dr. Galen E. Howard is a resident of Texas. He is a urologist who practices at Urology Associates of Denton in Denton, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

26. Defendant Dr. Daniel G. McBride is a resident of Texas. He is a urologist who practices at Urology Associates of Denton in Denton, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

27. Defendant Dr. Dennis L. Ortiz is a resident of Texas. He is a urologist who practices at North Central Urology, PA, in Colleyville, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

28. Defendant Dr. William A. Smith Jr. is a resident of Texas. He is a urologist who practices at the Medical and Surgical Clinic of Irving in Irving, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

29. Defendant Dr. Robert G. Stroud is a resident of Texas. He is a urologist who practices at Lonestar Urology in Fort Worth, Texas, and is an investor in Defendant SL North Texas Leasing, LLC.

## IV. RULE 9(b), FED. R. CIV. P., ALLEGATIONS

30. Some of the evidence necessary to prove the allegations in this complaint, such as the documents related to claims submitted to the government healthcare programs, is in the possession of either the physician practices, the Defendants, the United States, or the States.

31. With respect to each allegation made upon information and belief, Relator has, based upon knowledge, data, and experience, a reasoned factual basis to make the allegation but lacks complete details of it.

## V. BACKGROUND REGARDING RADIATION ONCOLOGY AND THE TREATMENT OF PROSTATE CANCER[1]

32. About 12% of American men will develop prostate cancer. In 2015 approximately 220,000 men were newly diagnosed with prostate cancer and there are approximately three million men living with prostate cancer in the United States. It is a disease that particularly affects older populations, with 60% of all prostate cancers diagnosed in men 65 or older, the vast majority of whom are insured through the Medicare program or other federally-funded health insurance programs.

33. Several prostate-cancer treatments "are often considered equally appropriate, as experts have not established a 'gold standard' for the treatment of cancer that has not spread beyond the prostate (i.e., localized prostate cancer), which represents a large majority of newly diagnosed prostate cancers." United States Government Accountability Office, Report to

[1] This complaint focuses on prostate cancer referrals, because that is the principal focus of Defendants' scheme. However, referrals regarding breast, neck, skin, and other cancers are equally subject to the scheme described below.

Congressional Requesters, Medicare: Higher Use of Costly Prostate Cancer Treatment by Providers Who Self-Refer Warrants Scrutiny, at 2 (GAO-13-525 July 2013), *available at* http://www.gao.gov/assets/660/656026.pdf.

34. For localized prostate cancers that are low risk,[2] radical prostatectomy (removal of the prostate), brachytherapy (also known as "seed therapy" or treatment by implanting "radioactive pellets"), and Intensity-Modulated Radiation Therapy (IMRT, or treatment using a beam of radiation from an expensive machine called a linear accelerator) are considered appropriate treatments. *Id.*[3]

35. Most or all of the treatment delivered at Sightline facilities consists of IMRT.[4] IMRT is one of the most expensive methods of treating prostate cancer. *Id.* at 5. "In 2010, expenditures for prostate cancer-related IMRT services accounted for about 55 percent of the $1.27 billion that Medicare paid for all IMRT services under Medicare Part B." *Id.*

36. The delivery of IMRT is an intensive process. After being referred to a facility, a patient generally meets with a radiation oncologist who orders an imaging of the tumor (*e.g.*, a CT scan) and develops a radiation treatment plan. The patient must then visit the facility for five days a week, usually for eight or nine weeks, to receive a course of 40 to 45 treatments.

---

[2] According to the National Cancer Institute, 81% of men diagnosed with prostate cancer from 2002 through 2008 in 18 geographic areas that provided cancer data to the National Cancer Institute were diagnosed with localized prostate cancer. *Id.*

[3] Other treatments include active surveillance, in which the tumor's growth is monitored without any further intervention, and hormone therapy, in which hormones are injected into the patient in order to block the action of male sex hormones that can cause the cancer to grow.

[4] While IMRT is the focus of this complaint, Defendants may also perform other types of expensive external beam radiation therapy (EBRT), such as image-guided radiation therapy (IGRT), which is similar to IMRT. IMRT differs from these in that the linear accelerator, which creates the radiation beam, is equipped with a multileaf collimator—a series of small, adjustable lead plates—that allows the physician to conform the radiation beam to the shape of the organ being treated. The specific type of EBRT provided is immaterial to the scheme.

37. Medicare and other insurers pay about $30,000 for a course of IMRT to treat prostate cancer. *Id.* at 9. By comparison, a course of brachytherapy costs Medicare about $17,000, and a prostatectomy costs about $16,500. *Id.* at 9. "IMRT remains substantially more expensive than other treatments for prostate cancer." *Id.*

## VI. APPLICABLE LAWS AND GUIDANCE

### A. Government Healthcare Programs

38. The Medicare program is administered by the Centers for Medicare and Medicaid Services (CMS) on behalf of the Secretary of Health and Human Services. Medicare Part A, 42 U.S.C. §§ 1395c-1395i, provides insurance for covered inpatient hospital and related services. Medicare "Part B," 42 U.S.C. §§ 1395j-1395w, is a supplemental program covering other items and services, such as out-patient hospital and physician services, supplies, and laboratory tests. Medicare Part C covers certain managed care plans, and Medicare Part D provides subsidized prescription drug coverage for Medicare beneficiaries. Medicare Part B covers the items and services described in this complaint.

39. Medicaid is a public assistance program providing for payment of medical expenses for the poor and disabled. Funding for Medicaid is shared between the federal government and state governments. For dual-eligible patients (those eligible for both Medicaid and Medicare), Medicaid pays the deductible for Medicare patients.

40. Although Medicaid is administered on a state-by-state basis, the state programs generally adhere to federal guidelines. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation. 42 U.S.C. § 1396 *et seq*.

41. In addition to Medicare and Medicaid, the federal government provides reimbursement, in whole or part, for medical services, approved drugs and medical devices under several other federal healthcare programs, including, but not limited to, CHAMPUS/TRICARE, CHAMPVA, the Federal Employees Health Benefit Program, and the Indian Health Service.

42. CHAMPUS/TRICARE, administered by the United States Department of Defense, is a healthcare program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veterans Affairs, is a healthcare program for the families of veterans with 100% service-connected disabilities. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and their survivors. The Indian Health Service, administered by the Department of Health and Human Services, provides healthcare services to Native Americans.

43. All of these programs reimburse providers for medically necessary radiation oncology services provided to their beneficiaries.

**B. <u>Federal and State False Claims Acts</u>**

44. The federal False Claims Act (FCA) prohibits, *inter alia*, (a) knowingly presenting or causing to be presented a false or fraudulent claim; (b) knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim; and (c) conspiring to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C). Any person who violates the FCA is liable for treble the amount of damages sustained by the United States plus civil penalties. Those penalties are $5,500 to $11,000 per false claim for claims submitted before November 2, 2016; penalties are between $10,781 and $21,563 per false claim for claim submitted on or after that date.

45. The FCA defines "knowingly" as "hav[ing] actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the information." 31 U.S.C. § 3729(b)(1). It requires no proof of specific intent to defraud. *Id.*

46. The FCA defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

47. The FCAs of California, Colorado, Texas, and Washington have materially similar provisions.[5]

**C. <u>The Anti-Kickback Statute</u>**

48. The Anti-Kickback Statute (AKS) was enacted in 1972. It resulted from congressional concern that payoffs to those who can influence healthcare decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of the program from these difficult to detect harms, Congress enacted a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care.

49. First enacted in 1972, Congress strengthened the statute in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

---

[5] California False Claims Act, Cal. Gov. Code § 12651(a) *et seq.*; Colorado Medicaid False Claims Act, Colo. Rev. Stat. § 25.5-4-305 *et seq.*; Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code § 36.002 *et seq.*; Washington State Medicaid Fraud False Claims Act, Rev. Code Wash. § 74.66.050, *et seq.*

50. The AKS prohibits any person or entity from knowingly and willfully making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally-funded medical services, including services provided under the Medicare, Medicaid, and TRICARE programs. 42 U.S.C. § 1320a-7b(b).[6]

51. Offering or paying remuneration of any kind violates the statute if one purpose of the payment is to induce referrals.

52. The term "remuneration" includes anything of value, in whatever form, whether in cash or in kind, offered directly or indirectly.

53. Remuneration offered or paid to physicians to encourage or reward referrals of patients for radiation oncology services is a kickback. So is offering the opportunity to earn money in exchange for such referrals. *United States v. Bay State Ambulance and Hospital Rental Co.*, 874 F.2d 20, 26 (1st Cir. 1989).

54. Compliance with the AKS is, as a matter of law, material to government payors' decisions to pay claims under federal and state healthcare programs.

55. Claims submitted as a result of kickback-tainted relationships are false claims under the False Claims Act. 42 U.S.C. § 1320a-7b(g). Violation of the statute may subject the participants in the kickback transactions to exclusion from participation in federal health care programs, 42 U.S.C. § 1320a-7(b)(7), and civil monetary penalties of $50,000 per violation and three times the amount of remuneration paid, 42 U.S.C. § 1320a-7a(a)(7).

[6] Safe harbors protect certain arrangements from AKS liability if they strictly conform to the requirements of the safe harbor. Of those potentially available for the arrangements described herein, the investment interests safe harbor at 42 C.F.R. § 1001.952(a) would be most relevant. But Defendants cannot meet this safe harbor because the physician investors own 80% of the joint venture's stock, as explained *infra*. *C.f.* 42 C.F.R. § 1001.952(a)(2)(i) (requiring ownership of no more than 40% of investment interests).

D. **The Stark Law**

56. In 1989, Congress enacted the federal physician self-referral prohibition, or "Stark Statute," 42 U.S.C. § 1395nn, to "curb overutilization of [Medicare] services by physicians who could profit by referring patients to facilities in which they have a financial interest." *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 95 (3d Cir. 2009) (internal quotation marks omitted).

57. The statute prohibits a physician from referring a patient to an entity for the furnishing of "designated health services" (DHS), if the physician, or his or her immediate family member, has a "financial relationship" with the entity. 42 U.S.C. § 1395nn(a)(1)(A). The statute also prohibits the entity from "present[ing] or caus[ing] to be presented" any claim for Medicare reimbursement for DHS that was "furnished pursuant to a [prohibited] referral." 42 U.S.C. § 1395nn(a)(1)(B).[7]

58. The Stark Statute initially regulated only physician referrals for clinical laboratory services. It was later amended to cover additional DHS that Congress determined to be susceptible to overutilization, including inpatient and outpatient hospital services, clinical laboratory services, and radiology services, such as radiation therapy services and supplies. 42 U.S.C. § 1395nn(h)(6). The amendment also applied its provisions to both Medicare and Medicaid. 42 C.F.R. § 411.351; Pub. L. No. 103-66, § 13562, 107 Stat. 312, 596 (1993).

59. The term "financial relationship" is defined broadly to include any direct or indirect "compensation arrangement" involving "any remuneration between a physician . . . and

---

[7] Regulations provide exceptions to the Stark law's prohibitions for certain arrangements. 42 C.F.R. § 411.357. Of those potentially available for the arrangements described herein, the "rental of office space" and "indirect compensation arrangements" exceptions at 42 C.F.R. § 411.357(a) and (p) would be most relevant. But these cannot be met here because, *inter alia*, the payments from the radiation oncology practice to the leasing joint venture, as described below, are "determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing" services. *Id.* §411.357(a)(5) & (p)(1)(i).

an entity" that is not otherwise excepted by statute. 42 U.S.C. § 1395nn(a)(2) (defining "financial relationship"); *id.* § 1395nn(h)(1) (defining "compensation arrangement"); *see also* 42 C.F.R. § 411.354.

60. Three elements establish an "indirect compensation arrangement." First, an "unbroken chain" of financial relationships involving either ownership or compensation links the referring physician to the entity furnishing DHS. Second, aggregate compensation to the referring physician from the person or entity in this "unbroken chain" with which he or she has a direct financial relationship varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS. Third, the entity furnishing DHS has actual knowledge of, or acts in reckless disregard or deliberate ignorance of, the fact that the referring physician's aggregate compensation varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS. 42 C.F.R. § 411.354(c)(2).

61. Any "request by a physician for an item or service" qualifies as a referral under the Stark statute. Therefore, a physician's referral of a federally-insured patient to a radiation oncologist for provision of DHS is prohibited, if the physician has an indirect financial relationships with the radiation oncologist.

62. Compliance with the Stark law, 42 U.S.C. § 1395nn, is material to government payors' decisions to pay claims under federal and state healthcare programs.

63. No payment will be made for DHS provided in violation of the Stark Statute. 42 U.S.C. § 1395nn(g)(1).

## E. <u>OIG Guidance Regarding Joint Ventures</u>

64. The Office of Inspector General of the Department of Health and Human Services (OIG) issues guidance regarding compliance with the AKS, for which it has enforcement responsibility. It publishes, among other things, Special Fraud Alerts and Advisory Opinions that result from its advisory opinion process whereby parties may seek OIG's views regarding the applicability of the AKS to proposed arrangements.

65. OIG is skeptical of joint ventures that give physicians a financial interest in their own referrals. In August 1989, OIG warned that joint ventures are suspect under the AKS where physician investors refer their own patients to the joint venture "and are paid by the entity in the form of 'profit distributions.'" *Special Fraud Alert: Joint Venture Arrangements* (Aug. 1989), *reprinted at* 59 F.R. 65373 (Dec. 19, 1994). "These subject joint ventures may be intended not so much to raise investment capital legitimately to start a business, but to *lock up a stream of referrals* from the physician investors and to compensate them indirectly for these referrals." *Id.* (emphasis added).

66. OIG focused analysis on how physician investors are selected and retained; the nature and structure of the venture; and how profits are distributed. *Id.* "Questionable features," include the following:

- "Investors are chosen because they are in a position to make referrals";
- "Physician investors may be actively encouraged to make referrals to the venture, and may be encouraged to divest their ownership interest if they fail to sustain an 'acceptable' level of referrals";
- "Investors may be required to divest their ownership interest if they cease to practice in the service area, for example, if they move, become disabled or retire";
- "Investment interests may be nontransferable";

- "The amount of capital invested by the physician may be disproportionately small and the returns on investment may be disproportionately large when compared to a typical investment in a new business enterprise";

- "Physician investors may be permitted to 'borrow' the amount of the 'investment' from the entity, and pay it back through deductions from profit distributions, thus eliminating even the need to contribute cash to the partnership"; and

- "Investors may be paid extraordinary returns on the investment in comparison with the risk involved, often well over 50 to 100 percent per year."

*Id.*

67. In 1997, the OIG provided guidance to a radiology group and a hospital system contemplating a joint venture. OIG Adv. Op. 97-5 (Oct. 6, 1997). OIG cautioned that "the major concern is that the profit distributions to investors in the joint venture, who are also referral sources to the joint venture, may potentially represent remuneration for those referrals." *Id.* at 7. The OIG examined "whether the party making the referrals receives a disproportionate return on its investment compared to the return on the investment of the party receiving the referrals. Any excess or disproportionate return on the investment may be remuneration for referrals." *Id.* at 10. Further,

> even in situations where each party's return is proportionate with its investment, the mere opportunity to invest (and consequently receive profit distributions) may in certain circumstances constitute illegal remuneration if offered in exchange for past or future referrals. Such situations may include arrangements where one or several investors in a joint venture control a sufficiently-large stream of referrals to make the venture's success highly likely . . . or the financial investment required is so small that the investors have little or no real risk.

*Id.* at 10.

68. OIG reiterated the concerns expressed in the 1989 Special Fraud Alert in a 2003 Special Advisory Bulletin concerning the "proliferation of arrangements between those in a position to refer business, such as physicians, and those providing items . . . for which Medicare .

. . pays." OIG, Special Advisory Bulletin on Contractual Joint Ventures, *reprinted at* 68 Fed. Reg. 23,148 (Apr. 30, 2003).

69. OIG also warned that joint ventures are suspect where physicians in one line of business expand "into a related line of business, which is dependent on referrals from the [physicians'] existing line of business." *Id.* at 23,149. This is especially true where the physicians "neither operate[] the new business nor commit[] substantial financial, capital, or human resources to the venture." *Id.* "While the contract terms of these arrangements may appear to place [the physicians] at financial risk, the [physicians'] actual business risk is minimal because of the [physicians'] ability to influence substantial referrals to the new business." *Id.*

> Aggregate payments to the [manager of the joint venture, which substantially operates the venture without the assistance of the physicians,] typically vary with the value or volume of business generated for the new business by the [physicians] . . . . Likewise, the [physicians'] payments, that is the difference between the net revenues for the new business and its expenses (including payments to the [manager of the joint venture]), also vary based on the [physicians'] referrals to the new business.

*Id.*

70. The 2013 Special Fraud Alert references prior OIG guidance about the legal issues under the AKS raised by physician-owned entities, and reiterates four long-standing concerns: (1) the corruption of medical judgment, (2) overutilization, (3) increased costs of federal health care programs, and (4) unfair competition. OIG Special Fraud Alert: Physician-Owned Entities (Mar. 26, 2013).

71. The 2013 Special Fraud Alert concludes that Physician Owned Distributorships (PODs) are "inherently suspect" under the AKS, and it reiterates OIG's prior guidance that the opportunity for a referring physician to earn a profit, including through an investment return from an entity for which the physician generates business, could constitute illegal remuneration

under the AKS. OIG identified the following four features, among others, that may render PODs particularly suspect: (1) selecting physicians based on their position to generate business through referrals, (2) requiring, pressuring, or actively encouraging its physician-investors to refer, recommend, or arrange for the purchase of the POD's devices, (3) retaining repurchase rights for a physician investor's failure or inability to arrange for the purchase of the POD's devices, and (4) operating through a "shell structure."

72. The 2013 Special Fraud Alert also expresses concern over a POD having a small number of physician-owners, such that the volume or value of a particular physician-owner's recommendations or referrals closely correlates to that physician-owner's return on investment.

73. As described below, the Sightline/ION radiation oncology clinics that are the subject of this complaint exhibit most of the features that OIG has identified as typical of arrangements that may violate the AKS and result in false claims under the FCA.

### F. **Providers Are on Notice that Compliance with the Anti-Kickback Statute and the Stark Law Are Material to Payment by Government Programs**

74. Government healthcare programs establish the material terms and conditions under which providers and suppliers may submit claims to government healthcare programs.

75. Compliance with the Anti-Kickback Statute and the Stark Laws are material conditions of payment. All claims for reimbursement submitted to government healthcare programs must comply with these laws.

76. Every participating provider and supplier agrees to comply with these terms and conditions in order to be eligible to provide services or supplies to government healthcare program beneficiaries.

77. Providers who wish to participate in Medicare must complete and periodically update an enrollment application. *See* 42 U.S.C. § 1395cc. The provider application requires

compliance with the requirements that the Secretary deems necessary to receive reimbursement from Medicare. The application, which must be signed by an authorized representative of the provider, contains a certification statement that states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider . . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

78. In addition, the AKS specifies that a claim "resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of" the False Claims Act. 42 U.S.C. § 1320a-7b(g). Stark prohibits payment of claims for designated health services provided in violation of its requirements. 42 U.S.C. § 1395nn(g)(1).

79. And, as discussed in section VI.E, the agency implementing these statutes has repeatedly issued guidance, including a Special Fraud Alert and Advisory Opinions, warning providers away from the specific conduct alleged herein.

80. Thus, the statutes, the provider agreements, and agency guidance have sent a clear message to providers, including Defendants, that violations of these laws are material to payment.

## VII. FACTS

81. Sightline and ION[8] use the promise of investment profits to induce doctors to invest in clinics which add no value to the communities in which they are established. Rather, they use the lure of easy profits to divert the physician-investors' patient referrals from

[8] Sightline Health and ION operate through a network of subsidiaries and affiliates, represent the facilities at issue interchangeably as both ION facilities and Sightline facilities, and are believed to share common practices, policies, and leadership. Relator therefore refers to both companies hereinafter as "Sightline."

established professional relationships to create a revenue stream from which Sightline and the physician-investors profit handsomely.

82. Sightline offers its physician-investors the ability to profit from the referral of cancer patients through majority ownership in a company that builds out and leases a radiation oncology clinic to a radiation oncologist—to whom the physician-investors then refer patients. Sightline's offer of an opportunity to earn money constitutes "remuneration" under the AKS.

83. That the purpose of the remuneration is to induce the referral of federally-insured patients to the radiation oncologist that leases Sightline's cancer clinic is plain from the structure of the relationship: It will only be successful if the physician-investors refer their patients to the clinic and will fail if they do not. Sightline's statements and conduct during the course of its courtship of the physician-investors involved in its Dallas, Texas, clinic, and the structure of the joint ventures it enters with physicians, evidence this fact.

### A. **Sightline's joint ventures allow non-physicians to aggregate healthcare dollars and skim a percentage off the top**

84. When it decides to establish a radiation oncology clinic in a new market, Sightline recruits local physicians—mainly urologists—who refer cancer patients to radiation oncologists for treatment.[9] These physicians are in a position to refer patients requiring cancer treatment to the radiation oncologist who will occupy Sightline's proposed clinic—that is why Sightline targets them.

85. Sightline induces a group of these physicians to invest in a joint venture leasing company that will build out space for the radiation oncology clinic, which it will, in turn, lease to

[9] Many physician specialties involve the detection of, and referral to oncologists for, cancer. By soliciting urologists as investors, Sightline establishes a practice which cherry picks investors who refer, on average, a high volume of patients covered by federal healthcare programs.

a radiation oncologist. Sightline tells the physicians to refer their cancer patients to the clinic for treatment by the radiation oncologist, who pays rent to the leasing company for the clinic space. It tells the physicians that they will receive a portion of the revenues, derived from the radiation oncologist's treatment of the patients they referred, through profit distributions from the leasing company in which they are investors.

86. By bringing the physician-investors into an investment relationship with an entity that leases facilities to a radiation oncologist, whose rental payments reward those physician-investors for their referrals, Sightline effectively guarantees that the physician-investors will refer their patients to that radiation oncologist.

87. Sightline's physician-investors are an assured pipeline of referrals to the Sightline clinic. Because Sightline selects those physician-investors who are already established in their communities, it does not need to compete based on quality of care or facilities for patients. Rather, it simply seizes an existing referral stream from the radiation oncology practice or practices to which the physician-investors previously referred their patients.

88. Because Sightline's coterie of physician-investors constitute an essentially-guaranteed referral stream, its entry into a community is a zero-sum proposition: The physician-investors profit from their existing patient load because they refer, in essence, to their own new radiation oncology practice, and the radiation oncology practice or practices to which they previously referred their patients suffer a loss of referrals. Sightline's manipulation of the marketplace reflects precisely the abuse which the Anti-Kickback Statute was intended to combat.

89. As noted, Sightline effects its kickback scheme through a series of affiliated and subsidiary companies, the center of which—for any given clinic—is the leasing company.

90. The physician-investors together own 80% of the leasing company and thus receive 80% of its profit distributions. They must invest or guarantee approximately $100,000. Sightline arranges financing for 100% of the physicians' investments, collateralized only by the physicians' interest in the leasing company. Sightline also tells the physician-investors that they will most likely make this amount back during the first year of operation.

91. Sightline owns the other 20% of the leasing company, receiving 20% of profit distributions, but the Company Agreement gives Sightline absolute control over most business decisions through its appointment of two out of the three managers of the leasing company. Sightline also takes a percentage of revenues, up to $30,000 a month, as a "management fee."

92. Sightline, through its subsidiary Sightline Oncology Services, also provides—and collects fees for—management, billing, and collection services to the radiation oncologist who is the tenant of the joint venture leasing company, whom it recruits for that position. The relationship between Sightline and the radiation oncologist is not arm's-length.[10]

93. The group of physicians Sightline targets as investors treats enough cancer patients to cause referrals which will assure the clinic's success and its substantial profitability. While the clinic may receive some referrals from physicians other than its investors, upon information and belief, nearly all of its referrals come from the investing physicians.

94. The profits remitted to the physician-investors increase with the volume of patients referred to the oncologist who rents the clinic, because, at most Sightline clinics, the rent

[10] Defendant Farnsworth, for example, personally recruited a radiation oncologist for a new clinic in Texas and offered her compensation of 65% of the new clinic's net earnings in the first year of operation, amounting to nearly $1 million. Her cut would increase to 70% of net earnings in years two, three, and four of the contract.

the radiation oncologist pays to the joint venture, and thus the distribution of profits back to the investing physicians, increases with more referrals.[11]

95. In addition, upon information and belief, the investor-physicians refer most of their patients for the very expensive IMRT treatments when equivalent, less expensive therapies would often be suitable for treatment.

96. Thus, the investing physicians, who own 80% of the leasing company, refer cancer patients to the clinic for treatment with IMRT, one of the most costly forms of cancer treatment and one which is often not medically indicated. Sightline bills insurance, including government payors, for the radiation oncologist's work; the radiation oncologist pays the leasing company its rent; and profits illegally flow back to the physician-investors as profit distributions through the leasing company.

97. The physician-investors play no role in recruiting the radiation oncologist to whom they will refer patients, nor any controlling role in the management or business decisions of the leasing company, despite owning 80% of the company. Rather, the physician-investors' role is to invest or guarantee approximately $100,000 each (which Sightline tells them they will make back in the first year), refer cancer patients to the clinic, and cash the checks.

98. By offering physicians the ability to profit, virtually risk-free, in a way that takes into account the volume and value of their referrals to the clinics, Sightline violates the AKS. The physician-investors also violate the AKS by accepting remuneration from Sightline to refer their patients to its clinics. In addition, the physician-investors violate Stark by referring their patients for designated health services to Sightline's clinics—entities in which they have an indirect financial interest. Claims knowingly submitted to federal and state healthcare programs

[11] In one example of which Relator is aware, the rent is fixed, but was inflated to take account of the value of the physician-owners' referrals.

in violation of either of these statutes are non-payable and constitute false claims under the FCA and its state law equivalents.

**B. An Example of the Scheme: SL North Texas Leasing, LLC**

99. The North Dallas radiation oncology market consists primarily of "vertically-integrated" organizations, where physicians like urologists are employed by hospitals or large health systems. Employed physicians refer their cancer patients for treatment internally; their referrals are not available to a newcomer to the market, who must instead attract referrals from a limited number of independent physicians and physician groups.

100. Success for a newcomer to the market is unlikely because of pre-existing relationships and referral patterns. Competition for the limited number of referrals from independent physicians is pitched. Around 2002, for example, the well-known Arlington Cancer Center in Arlington, Texas, established a location in Trophy Club staffed with knowledgeable and skilled physicians. But approximately five years later it closed the location, because, upon information and belief, it was not able to garner sufficient referrals to remain in operation.

101. Sightline had a different idea. The clinic it established would not have to attract referrals: It would pay for them. By doing so, Sightline locked up enough referral streams from independent physicians, like urologists, that it guaranteed its clinic's success.

**1. Sightline offers and pays remuneration in exchange for referrals**

102. "Remuneration" is "anything of value." The OIG and the courts have interpreted this requirement broadly to include the offering of an opportunity to earn money. *E.g.* Adv. Op. 97-5 at 10; *United States v. Bay State Ambulance and Hospital Rental Co.*, 874 F.2d 20, 26 (1st Cir. 1989) ("Giving a person an opportunity to earn money may well be an inducement to that person to channel potential Medicare payments towards a particular recipient").

103. The remuneration Sightline offers and pays takes the form of profit distributions through the joint venture that it establishes with the referring physicians.

104. In the spring of 2013, Defendant Farnsworth's marketing employee, Bryan Shingleton, Director of Development for the Sightline Health subsidiary Sightline Development Company, approached at least 19 potential physician-investors in the North Dallas area, often in their offices, and quizzed them regarding their referral patterns, including the volume of their referrals. He also inquired regarding the referral patterns and volume of other physicians, some of whom he approached as additional investors.

105. These physicians included, among others, Defendants Dr. Bryan Bruner, Dr. Wayne D. Hey, Dr. Galen Howard, Dr. Daniel McBride, Dr. Dennis Ortiz, Dr. William Smith, Jr., and Dr. Robert Stroud, who became investors in the Sightline joint venture. Others may have invested as well.

106. The physicians were all urologists in Dallas/Fort Worth and its suburbs, and therefore all in a position to refer prostate-cancer patients for radiation treatment.

107. After initial inquiries, Shingleton invited the physicians to a series of informational meetings and dinners about the proposed kickback scheme. Many declined the offer. But Shingleton continued to court the physicians throughout 2013.

108. Sightline invited the physicians to a formal group meeting on June 6, 2013, at the Hilton Southlake Town Square in Southlake, Texas, at which more details of the proposed clinic were shared. Sightline Health personnel attended, including Farnsworth, Shingleton, and Chris Bright.

109. At the meeting, Farnsworth presented slides and described the Sightline business model. Either at the meeting or shortly thereafter, Sightline executives disseminated a document

called "Sightline Center Level Projections" that showed projected net earnings for the clinic growing from year one ($539,138) to year four ($921,421), totaling $3,238,634 over four years.

110. The same document showed anticipated "Distributions to Owners" of $1,401,452 the first year. Large distributions of $357,248 and $446,323 were anticipated in just the fourth and fifth months of operation, signaling to the potential investors that Sightline would return the bulk of the required initial "investments" within six months of operation. Upon information and belief, the physicians' initial "investments" were shams, elicited to create the appearance of an arm's-length transaction, and could only be returned so quickly because they were not necessary to securing the clinic's startup costs and initial financing.

111. The physician-investors would collectively own 80% of the joint venture leasing company. Each share entitles a physician to a "1% sharing ratio" in the company; when cash distributions are made, they are divided *pro rata* among the holders of the securities.[12] Each physician receives at least 8% of distributions, depending on how many shares he purchased.

112. Sightline Fort Worth Leasing Holdings, the affiliate of Sightline Development Company and Sightline Health through which Sightline guarantees itself a percentage of the profits, owns the other 20%.[13]

113. Sightline projected "Distributions to Owners" of $723,434 the second year, $692,551 the third year and $589,796 the fourth year of operation. The physician-investors

---

[12] Sightline Development Company has the power to issue additional physician-investor shares without the consent of existing physician-investors: The scheme is expandable.

[13] In addition to these, Sightline reserves to itself a portion of the joint venture's gross revenue as a "management fee," and also generates fees from providing "management," billing, and administrative services to the radiation oncology practice. In short, Sightline cuts itself a piece of the pie at several contractual junctures in the kickback scheme it initiates.

would receive 80% of these distributions, or $1.6 million over three years, for doing nothing but referring their cancer patients to the clinic.

114. To buttress these claims, Sightline invited the physicians to a meeting at Kirby's Steakhouse in Southlake, Texas, on September 26, 2013. A physician from Denver, who was an investor in the Sightline clinic there, presented at the meeting. He discussed the low-reimbursement "crisis" in urology and described the Sightline joint venture as the solution to the problem. He claimed that he was receiving $200,000 annually from the Sightline venture in which he invested in Denver. Relator believes the clinic the physician referred to is Century Care Centers in Denver, for which Defendant SL Denver Leasing serves as the leasing company.

115. In October 2013, Sightline formed the joint venture SL North Texas Leasing.[14] The physicians would be required to purchase at least eight shares each in the joint venture, which would serve as the vehicle through which the physician-investors would profit from their referrals. Sightline warned that shares were selling quickly and that the physicians should act fast to get their foot in the door.

116. Sightline continued to court the physician-investors through February 2014, with a closing celebration held at the upscale seafood restaurant, Truluck's, in Southlake, Texas, on February 19, 2014. The final documents were collected by July 2014 and the clinic began operation November 3, 2015, at Baylor Medical Center at Trophy Club, Texas. Sightline selected Dr. Charles Matthews as the radiation oncologist.

117. According to Texas Medical Board verification files, Dr. Matthews was issued a physician temporary license on October 20, 2014, and final licensure on November 7, 2014. Prior to acting as radiation oncologist at Lonestar Radiation Oncology, the Sightline facility that

[14] Sightline Development Company is SL North Texas Leasing's registered agent. Farnsworth and Chris Bright, COO of Sightline Development Company since 2005 and now COO of ION, were its directors.

leased the clinic space from SL North Texas Leasing, Dr. Matthews worked for Georgia Cancer Specialists in Greensboro, Georgia. He had no prior licensure in Texas and, according to the records of the Texas Medical Board, holds no hospital privileges in Texas.

118. None of the Defendant Physician-Investors had any previous referral relationship with Dr. Matthews and had no reason other than their investment interest in SL North Texas Leasing to refer their cancer patients to him at Lonestar Radiation Oncology.

119. Upon information and belief, during the first year of Lonestar's operation, the investor physicians all were repaid their initial "investments" of approximately $100,000 each.

120. As these facts show, Sightline offered physicians the opportunity to earn money on cancer referrals through SL North Texas Leasing. The physician-investors accepted Sightline's offer, referred their patients, and received payment as profit distributions through the joint venture.

**2. Sightline intends to induce referrals**

121. Shingleton told the physicians that only local physicians with active Texas medical licenses—that is, physicians in a position to direct referrals to the clinic—were invited to invest and that the venture would provide a means to increase their income. He explained that they would be expected to refer patients to the clinic for radiation treatment and then would share in the profits generated by those referrals.

122. The physician-investor shares in the Sightline Clinic are not freely marketable because the shares are unregistered securities. They can only be sold to physicians licensed in the state and carry other significant impediments to their transferability. The Sightline Agreement prohibits transfer of the shares without prior written consent of the managers, in their sole discretion (except to certain extremely limited "Permitted Transferees," such as a

physician's wholly-owned company). Sightline and the other investing physicians also have a right of first refusal.

123. In addition, Sightline requires the physician investors to abide by a non-compete clause which prohibits them from participating in any competing radiation oncology venture. This ensures the physicians can profit only from referrals they make to the Sightline clinic, by excluding all financial incentives to refer elsewhere.

### 3. <u>Sightline acts knowingly</u>

124. Upon information and belief, Sightline and Farnsworth knew that Sightline's arrangements violated the AKS, Stark, and the False Claims Act.

125. For example, Sightline knew that its joint ventures were under investigation by the OIG no later than August 2012. By email of November 12, 2013, Farnsworth contacted the physician-investors in Dallas to explain, in response to their inquiry, that OIG had contacted Sightline with a request for records in August. He downplayed the inquiry as a "very generic two-page records request" resulting, he suspected, from a competitor in Los Angeles who had reported the company to OIG. He stated that Sightline had responded in full to the request and had not heard anything more, implying to the physicians that the arrangements must, therefore, be legal.

126. Notwithstanding this, the terms of the stock purchase that were shared in early December, 2013, advised the physicians, in a ten-page notice, that the arrangements could well be determined illegal under the AKS or Stark at any time. These papers specified that Sightline purposefully chose not to seek an OIG advisory opinion on the arrangement, deciding instead to play without a net.

127. Sightline is well aware that the purpose of its joint ventures is to induce the referral of patients to its cancer clinics and that the care provided to those patients is reimbursed by federal health care programs. Sightline knows that its arrangements violate the AKS and cause physicians to violate Stark, and that claims submitted in violation of these statutes are nonpayable false claims under the False Claims Act and its state equivalents.

**4. The remuneration Sightline provides causes the submission of false claims**

128. Nineteen of the physicians Sightline approached as potential investors in SL North Texas Leasing in the spring of 2013 already had existing relationships with an independent North Dallas radiation oncology center. These physicians had referred at least 277 cancer patients for radiation therapy to the independent radiation oncology practice in 2011. In 2012, these doctors had referred 300 patients, and, in 2013, they had referred 246 to this practice. Approximately 45% of these patients were insured by Medicare.

129. When the Sightline Clinic, Lonestar Radiation Oncology, became operational (and, in fact, well beforehand), the physicians who became investors—Defendants here—virtually ceased referring patients to the independent North Dallas oncology center. Those who did not invest generally have continued to refer to the oncology center at the same levels from 2011 to the present. This differential dramatically demonstrates the power of Sightline's kickbacks on the physician-investors' referrals.

130. Defendant physician-investors had collectively referred between 65 and 80 patients to the North Dallas oncology center annually in 2011, 2012, and 2013.

131. In 2014, after the physician-investors had signed on, but before the clinic was open, the investors' referrals to the North Dallas center dropped precipitously, from between 65-80 to just 15. On information and belief, the physician-investors were deferring treatment of

prostate-cancer patients until the clinic they were invested in opened for business, so they could refer the patients to the clinic, ensuring its early success and profiting from them.

132. In 2015, once Lonestar had opened, the referrals from the investing physicians to the North Dallas oncology center dropped even further, to just two. During the first eight months of 2016, the physician-investors collectively have referred just four patients to the independent North Dallas oncology center.[15]

133. One of the physician-investors, Dr. Ortiz, said that Lonestar in its first year had treated over 200 patients, nearly all of whom, upon information and belief, had been referred by the investing physicians. Because each IMRT patient's treatment results in approximately $30,000 in billings, just the referrals controlled by the seven physicians known to have invested in Sightline's clinic were more than sufficient to ensure the clinic's immediate success.

134. At least some of the investors had already been repaid their initial $100,000 investment in the first year. Sightline's projections were accurate.

135. On information and belief, the investing physicians are channeling nearly all cancer referrals to Lonestar.

### 5. <u>Sightline's scheme harms patients by delaying needed care</u>

136. During the months leading up to the signing of the paperwork in July 2014, Defendant Shingleton told the investing physicians to stockpile patients requiring cancer treatment so that, when the Lonestar Radiation Oncology opened, there would be a large supply of patients for the investing physicians to refer to the clinic. This would assure the clinic's immediate success and profitability.

[15] Each of these six patients (from 2015 and 2016) presented special circumstances, primarily involving patient requests for brachytherapy, insurance coverage issues, or special tests that Lonestar Radiation Oncology does not offer.

137. Shingleton and Bright said that the physician-investors at other Sightline clinics had held back patient referrals, once they had signed up as investors but before the clinic opened, in anticipation of referring the patients to the Sightline clinic once it opened. They suggested that Defendant physician investors accomplish this by holding patients on hormone therapy while the patients were waiting for treatment.

138. The most prevalent form of such hormone therapy is the intramuscular administration of leuprolide acetate, marketed under the trade name Lupron. This therapy has the beneficial effect of slowing the progression of many cases of prostate cancer. However, it does so by reducing the production of testosterone. As a consequence, side effects may include hot flashes; decreased libido; erectile dysfunction; breast enlargement; osteoporosis; weight gain; fatigue and anemia. Moreover, the sole indication of Lupron Depot, which is the most commonly-used form of leuprolide for prostate cancers, is "palliative treatment of advanced prostate cancer." Thus, using Lupron to arrest progression in order to delay treatment until a Sightline facility is up and running is off-label and inappropriate, subjecting patients to the risk of serious side effects for no therapeutic reason.

139. That the investing physicians followed these instructions is supported by the plummeting of the investing physicians' referrals to the independent North Dallas radiation oncology center even before the new clinic was operational in late 2014. Their referrals dropped from 65 in 2013 to just 15 in 2014, while the clinic only opened in November of 2014.

**C. <u>Sightline's joint ventures have all the hallmarks of kickback mills</u>**

140. The OIG delineated three main features of joint ventures that make them suspect as kickback vehicles: 1) selection of investors who can make referrals from which the venture receives revenue; 2) low investment risk to the investing physicians; and 3) extraordinary returns

compared to the risks involved. If the joint venture is meant to "lock up a stream of referrals" and "investors . . . control a sufficiently-large stream of referrals to make the venture's success highly likely . . . or the financial investment required is so small that the investors have little or no real risk," the joint venture is suspect as a disguise for kickbacks. Adv. Op. 97-5 at 10.

141. Sightline's joint ventures display all of these characteristics.

### 1. <u>The investors are selected for their ability to refer to the clinic</u>

142. As noted above, Sightline required the investors to be local physicians with active Texas medical licenses. Shingleton sought out as investors local physicians who could refer large volumes of patients to the clinic: mostly urologists. He quizzed the physicians on their volume of referrals and the volume of referrals of other potential investors.

143. During meetings where Sightline courted the investing physicians, it was often discussed that they had to refer their patients to the clinic in order for the venture to be successful: That was the purpose of the arrangement.

144. The physicians could not freely transfer their ownership. First, the investors would need the permission of the managers, two out of three of whom Sightline selected. In addition, the other investors (active physicians in a position to refer) and Sightline had a right-of-first-refusal if an investor wished to divest. If an investor became disabled or died, the other investors could purchase his shares; if no investor wanted to purchase the shares, Sightline was required to do so. In short, the persons who could benefit from the joint venture were limited to those who could refer to the clinic.

### 2. <u>The investors have almost no risk of loss</u>

145. The physician-investors have almost no risk of loss, because they collectively control sufficient referrals to guarantee the clinic's success.

146. The physician-investors were required to buy at least eight shares each, at $12,500 a share, making their initial investment at least $100,000.

147. But the physicians did not have to invest cash. They were permitted to borrow the required capital contribution. Sightline provided a "Terms Sheet" to potential investors reflecting a pre-negotiated arrangement for physicians to borrow the entire sum from the Bank of Houston on a five-year note at 4.5% interest. The only collateralization for the loan was "[a]ll interest and income distributions in partnership pursuant to a commercial security agreement together with all accessions, replacements and substitutions thereto or therefore and the proceeds thereof." That is, the loans which Sightline prearranged for the physician-investors were secured only by their expected profits from Sightline.

148. With projected distributions of $1.4 million the first year, bolstered by the large volume of patients resulting from stockpiling patients prior to the clinic's opening, Farnsworth and Shingleton both told the investors that they would likely make back their $100,000 "investments" in the first year of operation. Upon information and belief, that prediction became reality.

149. Beyond the actual numbers and promises, the structure of Sightline's clinic placed the success or failure of the venture fully within the investors' control. Without their referrals, the clinic would quickly fold; conversely, the physician-investors collectively virtually guaranteed the clinic's success by referring all their patients to it.

150. As OIG recognizes, "[w]hile the contract terms of these arrangements may appear to place [the physicians] at financial risk, the [physicians'] actual business risk is minimal because of the [physicians'] ability to influence substantial referrals to the new business." OIG, Special Advisory Bulletin on Contractual Joint Ventures, 68 Fed Reg. at 23,149.

### 3. The investors enjoy extraordinary returns

151. Given the virtual absence of risk—the investors collectively control enough referrals to guarantee the clinic's success—the investors' returns plainly display that the joint venture's sole purpose is to remunerate the doctors for their referrals.

152. Sightline's projections showed the physicians receiving an average of $160,000 in years two, three and four of the clinic's operation. These amounts could increase substantially with additional referrals.

153. The physician-investors are not involved in the day-to-day operation of the clinic or the leasing operation. Indeed, by Sightline's design they have next to no control over the company's operations, because Sightline hand-picks two out of the three managers, effectively controlling all management decisions, even though it owns just 20% of the company. The physician-investors are well aware that they have almost no control over the company's decisions, yet own 80% of it and receive 80% of its profits. The only reasonable explanation for this imbalance is that the profit distributions are intended to remunerate the physicians for their referrals to the clinic.

### 4. Other facts underline the nature of the joint venture as a kickback scheme

154. The clinic's lack of advertising underscores its reliance on investors to send it referrals. Upon information and belief, the clinic spends no money on marketing its services. But no advertising or name recognition is necessary, because the clinic relies on the investors to send it all the referrals it needs. It does not need to rely on advertising to attract referrals.

155. In addition, the investors were not involved in the selection of the radiation oncologist who would practice at the clinic. They were specifically blocked from such participation by Sightline. Upon information and belief, Dr. Charles Matthews, the radiation

oncologist selected by Sightline to open the Lonestar facility, had no pre-existing relationship with any of the referring investors and was not even from the area. Yet all the physician investors abruptly started referring substantially all of their patients to Dr. Matthews for treatment upon the clinic's opening. Such disinterest on the part of the referring physicians in the identity of the radiation oncologist to whom they refer their patients lies in stark contrast to the relationship these physicians pursued with the independent North Dallas radiation oncology practice to which the physicians had previously referred, and it speaks volumes regarding the purpose of the joint venture: not patient care, but doctor profit.

**D. <u>Sightline's joint ventures also violate Stark</u>**

156. The Stark laws make it illegal, among other things, for a physician to make referrals of Designated Health Services (DHS) to an entity with which he or she has a financial relationship, including an indirect compensation arrangement; and for that entity to claim reimbursement for such DHS. 42 U.S.C. § 1395nn(a)(1); 42 C.F.R. § 411.354(a)(1)(ii), (a)(2)(ii).

157. DHS includes radiation therapy services and supplies, which the radiation oncology practices at issue in this action provide. 42 U.S.C. § 1395nn(h)(6). The radiation oncology practices that are tenants of the leasing companies are therefore "entit[ies] furnishing DHS" as that term is used in 42 U.S.C. §1395nn and its implementing regulations, because they submit claims to federal health care programs for radiation therapy services. 42 C.F.R. §§ 411.351, 411.354. The specific Healthcare Common Procedure Coding System (HCPCS) codes representing radiation therapy services and supplies are identified and updated by CMS. The codes are available at https://www.cms.gov/medicare/fraud-and-abuse/physicianselfreferral/list_of_codes.html.

158. An indirect compensation arrangement exists between the referring physicians at issue in this action and the radiation oncology practices.

- First, an unbroken chain of ownership and compensation interests link the referring physicians to the entities furnishing DHS, in the form of: Referring Physicians > Leasing Companies > Radiation Oncology Practices. 42 C.F.R. § 411.354(c)(2)(i). The referring physicians have direct ownership interests in the leasing companies through their ownership of securities representing equity interests in the leasing companies. The leasing companies have direct compensation arrangements in the form of lease agreements with the radiation oncology practices, which are the entities furnishing DHS.

- Second, the aggregate compensation paid to the referring physicians takes into account the value of referrals generated by the referring physicians for the radiation oncology practices. 42 C.F.R. § 411.354(c)(2)(ii).[16] As explained above, the joint ventures' success relies upon locking in the referral streams of the investing physicians for the radiation oncology practice tenant, and once those referral streams has been secured with the promise of remuneration, their success is highly likely. The arrangements therefore take into account the value and the volume of the referrals generated by the referring physicians. The value of the investing physicians' referral streams is the *sine qua non* of the arrangement. The financial relationships can also vary with the volume of referrals generated by the referring physicians. The lease agreements between the radiation oncology practices and the leasing companies require the practices to pay for additional two-hour time blocks if they opt to use the facility more than 40 hours per week. Physician-investors are told that the "real money" lies not only in the physician owners referring all their radiation therapy business to the clinics, but increasing the volume of referrals. The goal is to channel as many referrals to the radiation oncology practice as possible.

---

[16] This is measured based on the leasing companies' relationships with the radiation oncology practices, because those are the "nonownership or noninvestment interest[s] closest to the referring physician." (The closest financial relationship between the physicians and another entity in the chain is their relationship with the leasing company, but that relationship is an ownership interest and is therefore not considered.) The regulation provides:

> "If the financial relationship between the physician (or immediate family member) and the person or entity in the chain with which the referring physician (or immediate family member) has a direct financial relationship is an ownership or investment interest, the determination whether the aggregate compensation varies with, or takes into account, the volume or value of referrals or other business generated by the referring physician for the entity furnishing the DHS will be measured by the nonownership or noninvestment interest closest to the referring physician (or immediate family member). (For example, if a referring physician has an ownership interest in company A, which owns company B, which has a compensation arrangement with company C, which has a compensation arrangement with entity D that furnishes DHS, we would look to the aggregate compensation between company B and company C for purposes of this paragraph (c)(2)(ii)).

42 C.F.R. § 411.354(c)(2)(ii).

- Third, upon information and belief, the radiation oncology practices either know, or act in reckless disregard or deliberate ignorance of, the fact that the referring physicians receive aggregate compensation that varies with or takes into account the volume or value of those physicians' referrals.

159. Because the referring physicians in this action had a financial relationships with the entities furnishing DHS, by law they were prohibited from making referrals to those entities. 42 U.S.C. § 1395nn(a)(1)(A). Referrals made in violation of the Stark Law are non-payable. *Id.* § 1395nn(a)(1)(B).

**E. <u>Sightline operates numerous clinics funded by physician-investors</u>**

160. While recruiting physician investors in the Dallas/Fort Worth area, Sightline revealed details regarding several other clinics, many of which had been ongoing for several years, to the potential investors. Its purpose was to show the potential investors how the arrangement worked in practice and how profitable they could expect their investment to be.

161. Prior to the Dallas/Fort Worth operation, Sightline had established clinics in, at least, Beverly Hills, Colorado Springs, Denver, Houston, Lubbock, Kansas City, Santa Monica, and Seattle. Sightline representatives, including Farnsworth and Shingleton, represented to the Dallas/Fort Worth physicians they were courting that the proposed North Dallas clinic would operate just like their earlier ventures in Beverly Hills, Houston, and Denver.

162. At a meeting on June 6, 2013, Farnsworth told the physician-investors that all Sightline clinics operated under similar arrangements. He identified the clinic in Beverly Hills as a model for the Dallas clinic. On information and belief, two Sightline affiliates, SL West Hills IMRT and Sightline West Hills IMRT Holdings, serve as the leasing and holding companies, respectively, for a Sightline clinic called Advanced Radiation Center of Beverly Hills, located at 8929 Wilshire Boulevard.

163. In early September 2013, Sightline invited the potential investors to a site visit at one of its clinics in Houston, the Century Cancer Centers Clinic, to illustrate how the Dallas clinic would operate. The visit also included meetings with existing Sightline physician investors, a tour of Sightline's corporate offices, and a party at Farnsworth's home.

164. Sightline also brought a physician-investor from the Century Cancer Centers clinic in Denver to tell the Dallas physicians that he received $200,000 annually through his ownership interest in the joint venture that leased space to that clinic, suggesting that they could do the same.

165. Given Sightline's representations, it is believed that each of these Sightline clinics follow substantially the same arrangement as the Dallas clinic.

## VIII. <u>Defendants cause the submission of false claims for payment that violate material conditions of payment under government healthcare programs</u>

166. Compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement from government healthcare programs. Submission of a claim for payment for a service that results from a kickback prohibited by the AKS is a false or fraudulent claim under the False Claims Act and its state equivalents, because such claims are not eligible for payment. Neither the United States nor any of the Plaintiff States would have paid such claims had they known of the kickbacks. 31 U.S.C. § 3729(a)-(b); 42 U.S.C. § 1320a-7b(b), (f), (g).

167. Compliance with the Stark statute is also a prerequisite to the right to submit claims for payment to government healthcare programs. Submission of claims for payment for services referred in violation of Stark are false or fraudulent claims under the False Claims Act and its state equivalents, because such claims are not eligible for payment. Neither the United States nor any of the Plaintiff States would have paid such claims had they known that they were referred in violation of Stark.

168. Physician Defendants certify compliance with the AKS and Stark annually in order to participate in the Medicare Program. "Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is actionable under the FCA." *United States ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

169. Sightline Defendants knowingly and willfully violate the AKS by offering and paying illegal remuneration to government healthcare program providers to induce those providers to refer their cancer patients for treatment at Sightline's clinics, for which payment is sought from federally-financed healthcare programs.

170. Physician Defendants knowingly and willfully violate the AKS by accepting illegal remuneration to refer their cancer patients for treatment at Sightline's clinics, for which payment is sought from federally-financed healthcare programs.

171. Defendants know, and at all times relevant to this action knew, that the radiation oncology practices bill government healthcare programs for services provided that result from illegal referrals under the AKS and Stark.

172. The purpose of Defendants' schemes is to virtually guarantee the success of the Sightline clinics by locking in referral streams that would otherwise go to other providers, increasing Sightline's market share and depriving other providers of referrals, all accomplished with taxpayer money.

173. Defendants know, and have at all relevant times known, that the entities billing government healthcare programs as part of their scheme are not in compliance with the AKS or Stark when Defendants caused them to submit claims for payment.[17]

[17] Although *scienter* is an element of an AKS violation, Stark is a strict liability statute. Nevertheless, Defendants were also aware that they were not in compliance with Stark's requirements.

174. Defendants know, and at all times relevant to this action knew, that the reasonable and foreseeable consequence of their schemes would be the submission of false claims to government healthcare programs and that payment of such claims would result.

175. Defendants' actions were and are a substantial factor in the submission of false claims.

176. Defendants conduct, if known, would be capable of influencing the Government's decision to pay these claims, which Defendants at all relevant times have known.

177. Notwithstanding this knowledge, Defendants caused the submission of false claims for radiation therapy services and supplies to government healthcare programs.

178. Defendants' schemes are corporately directed and nationwide in scope. Upon information and belief, they are ongoing.

179. Defendants' schemes have harmed, and continue to harm, federal and state healthcare programs.

**COUNT I: Violations of the False Claims Act**

180. The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

181. The False Claims Act imposes liability upon, *inter alia*, those who (a) knowingly present or cause to be presented a false or fraudulent claim; (b) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; and (c) conspire to violate either of the preceding provisions. 31 U.S.C. § 3729(a)(1)(A)-(C).

182. The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, makes it illegal to knowingly and willfully offer or pay, or solicit or receive, remuneration to induce the referral of business paid for in whole or in part by federal health care programs.

183. The Stark law, 42 U.S.C. § 1395nn, makes it illegal for physicians to refer patients for the provision of radiation therapy services and supplies, or for an entity to bill a federal health care program for those services and supplies, where a the physician and the entity furnishing the radiation therapy services and supplies have a financial relationship.

184. Sightline Defendants knowingly and willfully violate the Anti-Kickback Statute by offering and paying illegal remuneration to physicians to induce the referral of cancer patients to Sightline clinics for treatment, for which payment is sought from federal health care programs.

185. Physician Defendants knowingly and willfully violate the Anti-Kickback Statute by accepting illegal remuneration in exchange for referring their cancer patients to Sightline's clinics for treatment, for which payment is sought from federal health care programs.

186. Physician Defendants also violate Stark by referring cancer patients for the delivery of radiation therapy and services (designated health services) to an entity in which they have an indirect financial interest.

187. Compliance with the Anti-Kickback Statute and Stark are material conditions of payment for Medicare, Medicaid, and other federally-funded healthcare programs.

188. All claims submitted to federal health care programs for services provided to beneficiaries who are referred in violation of the Anti-Kickback Statute or Stark are nonpayable false claims within the meaning of the False Claims Act, because the United States would not pay such claims if it knew that such claims resulted from illegal referral relationships. Defendants' actions, if known, would affect the United States' decision to pay the resulting claim.

189. By virtue of the acts described above, Defendants knowingly present or cause to be presented false or fraudulent claims to government healthcare programs for payment or approval within the meaning of 31 U.S.C. § 3730(a)(1)(A) and (b)(2).

190. Physician Defendants, who are medical providers, certify that they agree to abide by Medicare laws, regulations, and program instructions, including compliance with the Anti-Kickback Statute and Stark, and that payment is conditioned on such compliance. Physician Defendants' violations of the Anti-Kickback Statute and Stark make these certifications, and the claims submitted pursuant to such certifications, false. Defendants foreseeably cause violations of the Anti-Kickback Statute and Stark and the resulting false certifications, and foreseeably cause false or fraudulent claims to be submitted to federal healthcare programs as a result of such violations.

191. By virtue of the acts described above, Defendants knowingly make, use, or cause to be made or used, false records or statements, and omit facts material to false or fraudulent claims to government healthcare programs for payment or approval, within the meaning of 31 U.S.C. § 3730(a)(1)(B) and (b)(2).

192. Defendants conspire to cause the submission of false claims to federal health care programs by endeavoring to conceal their violations of the Anti-Kickback Statute and Stark.

193. Defendants reached an agreement to participate in these schemes to falsely increase government healthcare utilization of their services, and each of them engages in one or more overt acts in furtherance of the conspiracy. Defendants' acts to conspire among and between themselves violates the False Claims Act. 31 U.S.C. § 3729(a)(1)(C).

194. These false claims result in significant reimbursement by government healthcare programs for amounts that such programs did not owe.

195. Defendants act knowingly, as that term is used in the False Claims Act. 31 U.S.C. § 3729(b)(1).

196. The United States, unaware of Defendants' violations of the AKS and Stark, and the resulting falsity of the claims submitted or caused to be submitted by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

197. Because the United States would not have paid for services which they know to have been the result of violations of the Anti-Kickback Statute or Stark, the United States is harmed in an amount equal to the amount it has paid for the claims resulting from the violations of the AKS or Stark.

198. The United States has been damaged, and continues to be damaged, as a result of Defendants' conduct in violation of the False Claims Act in an amount to be determined at trial.

**COUNT II: Violations of State False Claims Acts**

199. The allegations in the foregoing paragraphs are re-alleged as if fully set forth herein.

200. Relator asserts claims for treble damages and penalties under the False Claims Acts of California, Colorado, Texas, and Washington (Plaintiff States).

201. The False Claims Acts of the Plaintiff States impose liability upon, *inter alia*, those who knowingly present or cause to be presented false claims for payment or approval, and those who make or use, or cause to be made or used, false records or statements material to a false claim. Compliance with federal and state healthcare laws, including the federal AKS and

respective state AKSs,[18] is a material condition of payment of claims submitted to the Medicaid Programs of the Plaintiff States.

202. Defendants knowingly present or cause to be presented false claims to the Medicaid programs of the Plaintiff States by engaging in illegal kickback schemes, in knowing violation of material conditions of payment of those programs.

203. Defendants knowingly present or cause to be presented false claims to the Medicaid Programs of the Plaintiff States by knowingly engaging in a scheme to make and cause to be made material misrepresentations to government healthcare programs regarding the eligibility of claims for payment by those programs.

204. Defendants' actions, if known, would affect the Plaintiff State Governments' decisions to pay the resulting claims.

205. Defendants' actions violate material conditions of payment under the Plaintiff States' healthcare programs.

206. The resulting claims are noncovered and nonpayable and are false claims.

207. By virtue of the acts described above, Defendants knowingly present or cause to be presented false or fraudulent claims to the Plaintiff State Governments for payment or approval.

208. By virtue of the acts described above, Defendants knowingly make, use, or cause to be made or used false records and statements, and omit material facts, to induce the Plaintiff State Governments to approve and pay such false and fraudulent claims.

---

[18] Cal. Bus. & Prof. Code § 650 *et seq* ; Cal. Welfare & Inst. Code § 14107.2; Medi-Cal Provider's Manual at 2; Medi-Cal Provider Agreement ¶¶ 2, 20; Colo. Stat. § 25.5-4-414; Colo. Med. Asst. Prog. Manual, Gen. Provider Info. and Requirements, at 14; Colo. Med. Assist. Prog. Provider Participation Agreement §§ A, I, K, & at 24; Tex. Occ. Code § 102.001 *et seq.*; 1 Tex. Admin. Code §§ 371.27, 371.1707, 371.1709, 317.1711, 317.1713; Tex. Provider Procedures Manual, vol. 1, at 1-36, 1-37 – 1-42; Tex. Medicaid Provider Enrollment App. at 3-1 – 3-2, 3-5; Rev. Code Wash. § 74.66.020 *et seq.*; Rev. Code Wash. § 74.09.240.

209. Defendants conspire to cause the submission of false claims to the Plaintiff States' Medicaid programs by endeavoring to conceal their violations of the federal Anti-Kickback Statute and the Anti-Kickback Statutes of the Plaintiff States.

210. Defendants reached an agreement to participate in these schemes to falsely increase healthcare utilization of their services within the Plaintiff States, and each of them engage in one or more overt acts in furtherance of the conspiracy. Defendants' acts to conspire among and between themselves violate the false claims act conspiracy provisions of the Plaintiff States.

211. Defendants acted knowingly, as that term is used in the False Claims Acts of the Plaintiff States.

212. The Plaintiff State Governments, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

213. By reason of the Defendants' acts, the Plaintiff States have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Relator requests:

A. That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages the United States and States have sustained because of Defendants' actions, plus the maximum civil penalty allowed by law for each action in violation of 31 U.S.C. § 3729 and the laws of the Plaintiff States;

B. That in the event the United States intervenes in this action, Relator be awarded 25% of the proceeds of the action or the settlement of any such claim;

C. That in the event any Plaintiff State intervenes in this action, Relator be awarded the maximum percentage of the proceeds of the action or the settlement of any such claim permitted by the respective Plaintiff State statute;

D. That in the event the United States and States do not intervene in and proceed with this action, Relator be awarded 30% of the proceeds of this action or the settlement of any such claim;

E. That Relator be awarded all costs, attorneys' fees, and litigation expenses; and

F. That the United States, the Plaintiff States, and Relator receive all relief, both at law and in equity, to which they may reasonably be entitled.

Respectfully submitted,

Frederick M. Morgan, Jr. (OH 0027687)
Jennifer M. Verkamp (OH 0067198)
Maxwell S. Smith (OH 0089398)
Morgan Verkamp LLC
35 East 7th Street, Suite 600
Cincinnati, OH 45202
Telephone: (513) 651-4400
Fax: (513) 651-4405
Email: rmorgan@morganverkamp.com
jverkamp@morganverkamp.com
msmith@morganverkamp.com

Bruce F. Howell (TX 10091000)
Schwabe Williamson & Wyatt PC
PacWest Center
1211 SW Fifth Avenue, Suite 1900
Portland, OR 97204
Telephone: 503-796-2997
Email: bhowell@schwabe.com

Walter A. Herring (TX 9535300)
Munck Wilson Mandala LLP
12770 Coit Road, Suite. 600
Dallas, TX 75251
Telephone: 972-628-4515
Fax: 972-628-3616
Email: wherring@munckwilson.com

*Counsel for Relator IIRT, LLC*

**DO NOT SERVE**
**FALSE CLAIMS ACT COMPLAINT FILED UNDER SEAL**